2021 IL 125150

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 125150)

SUSAN STEED, as Independent Administrator of the Estate of Glenn Steed, Deceased, Appellee, v. REZIN ORTHOPEDICS AND SPORTS MEDICINE, S.C., Appellant.

*Opinion filed January 22, 2021.—Modified upon denial of rehearing March 22, 2021.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Theis, Neville, Michael J. Burke, and Carter concurred in the judgment and opinion.

## OPINION

¶ 1      The plaintiff, Susan Steed, as independent administrator of the estate of Glenn Steed, filed a wrongful death and survival action against the defendant, Stephen H. Treacy, M.D., alleging medical negligence for his failure to diagnose and treat a deep vein thrombosis (DVT) in Glenn's injured leg before the DVT progressed to

a fatal pulmonary embolism, and against the defendant, Rezin Orthopedics and Sports Medicine, S.C. (Rezin Orthopedics), alleging institutional negligence that caused Glenn's death. After trial, the jury returned a verdict in favor of the defendants, and the circuit court denied the plaintiff's request for judgment notwithstanding the verdict (judgment *n.o.v.*) against Rezin Orthopedics. The plaintiff directed her motion for judgment *n.o.v.* against Rezin Orthopedics only and appealed the verdict in favor of Rezin Orthopedics only. On appeal, the appellate court reversed the Will County circuit court's judgment and remanded the cause with directions to enter judgment *n.o.v.* in favor of the plaintiff and against Rezin Orthopedics and to hold a new trial on the sole issue of damages. 2019 IL App (3d) 170299-U. We allowed Rezin Orthopedics' petition for leave to appeal (Ill. S. Ct. R. 315 (eff. July 1, 2018)).

¶ 2        The issues presented in this appeal involve whether the appellate court properly directed judgment *n.o.v.* in the plaintiff's favor and, alternatively, whether the plaintiff is entitled to a new trial because the verdict was against the manifest weight of the evidence or because the circuit court allowed allegedly irrelevant and prejudicial evidence and argument at trial. For the following reasons, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

¶ 3                                                    BACKGROUND

¶ 4        On January 29, 2009, Glenn suffered a partial tear of his Achilles tendon. On February 17, 2009, Glenn first sought treatment for his injury from Dr. Treacy, a medical doctor specializing in orthopedic surgery at Rezin Orthopedics. Dr. Treacy, at the Plainfield office of Rezin Orthopedics, noted Glenn's history, including that he was 42 years old and borderline obese, physically examined him, and diagnosed his injury. Dr. Treacy's treatment plan included placing Glenn's lower right leg in a plantar flexion position, with his ankle pointed in a downward direction, set in a plaster cast for six weeks. Dr. Treacy memorialized his recommendation for Glenn to return for a follow-up appointment in two weeks in a "super bill," a form used by Rezin Orthopedics to generate an invoice for physician services. Two weeks from Glenn's initial appointment with Dr. Treacy calculated to March 3, 2009. In addition to the follow-up appointment, Glenn required an appointment within a day

or two for cast placement. Glenn chose not to be casted at his initial visit because he had driven himself to the appointment.

¶ 5        Accordingly, following Glenn's appointment on February 17, 2009, Dr. Treacy directed Rezin Orthopedics receptionist Jodi Decker to schedule a two-week follow-up appointment. Decker scheduled Glenn's casting appointment for February 19, 2009, at the Joliet office of Rezin Orthopedics but did not schedule the follow-up appointment. After Glenn's leg was casted on February 19, 2009, the receptionist, Victoria Hare, scheduled Glenn's follow-up appointment for March 13, 2009, more than three weeks subsequent to his initial February 17, 2009, appointment with Dr. Treacy. On February 25, 2009, Glenn telephoned Rezin Orthopedics, and the receptionist, Rossana Popplewell, rescheduled Glenn's follow-up office visit for one day earlier than originally scheduled, March 12, 2009, instead of March 13, 2009. On March 8, 2009, Glenn died of a pulmonary embolism.

¶ 6        On July 13, 2012, the plaintiff filed a fourth amended complaint, alleging a wrongful death and survival action against Dr. Treacy, which is not at issue here, and Rezin Orthopedics. In her complaint, the plaintiff alleged that Rezin Orthopedics negligently failed to monitor Glenn's condition, failed to timely schedule a follow-up appointment for Glenn pursuant to the physician's order, failed to communicate Glenn's concerns to a physician following his February 25, 2009, telephone call, failed to advise Glenn of risks during the telephone call, and failed to advise Glenn to return to its office or seek immediate medical care during the telephone call. The plaintiff alleged that, as a direct and proximate result of these failures, a DVT and resulting pulmonary embolism were not discovered, diagnosed, and/or treated, resulting in Glenn's death on March 8, 2009.

¶ 7        Prior to trial, the circuit court granted the plaintiff's motion *in limine* number 10, seeking to bar defense witnesses from testifying about why Glenn's follow-up appointment was set for March 13, 2009. With regard to the defendant's motion *in limine* number 32, seeking to bar as hearsay the plaintiff's testimony recounting her husband's description of the content of his February 25, 2009, telephone conversation with Rezin Orthopedics, the circuit court barred the plaintiff's testimony as to what Glenn had told her about his statements to the receptionist and what Glenn had told her about the receptionist's response. The circuit court allowed

the plaintiff's testimony regarding the complaints Glenn voiced to her directly.

¶ 8                                     Jury Trial

¶ 9        At trial in November 2016, the plaintiff, Glenn's widow, testified that when Glenn returned home from cast placement by Rezin Orthopedics, he remained uncomfortable and achy from acclimating to the cast and the crutches. The plaintiff testified that four or five days later Glenn reported to her that the achiness in his leg felt weird and tight, and on February 25, 2009, Glenn phoned Rezin Orthopedics. The plaintiff testified that, prior to his phone call to Rezin Orthopedics, Glenn had been elevating his leg on the ottoman but that the elevation had not resolved the tightness. The plaintiff testified that, subsequent to the phone call, Glenn elevated his leg even higher and iced behind his knee and that he also began taking an over-the-counter nonsteroidal anti-inflammatory drug, which somewhat alleviated his pain. The plaintiff testified that the achiness and tightness in Glenn's leg lingered but did not worsen. The plaintiff testified, however, that late in the evening of March 7, 2009, Glenn experienced pain in his right thigh for the first time. The plaintiff testified that they had planned for Glenn to telephone Rezin Orthopedics the following Monday morning, but on Sunday morning, March 8, 2009, Glenn died as a result of suffering a pulmonary embolism.

¶ 10       Dr. Treacy testified that when he examined Glenn on February 17, 2009, Glenn reported swelling and pain in his right ankle. During the examination, Dr. Treacy identified mild swelling of Glenn's lower leg but noted that the pain and swelling had been resolving. Dr. Treacy explained that by placing Glenn's lower right leg in a cast, in a plantar flexion position, Glenn's ankle joint would remain stationary. Dr. Treacy explained that Glenn's injury to the leg and the resulting treatment of immobilizing the ankle with a cast were risk factors for a DVT, which he addressed during Glenn's examination.

¶ 11       Dr. Treacy explained that a DVT involves a deep vein blood clot in an extremity that may cause no harm or significant harm. Dr. Treacy opined that occlusion of a vessel may affect blood flow and cause swelling, pain, and other problems. Dr. Treacy further explained that, with a DVT, the blood clot may break free from the wall of the vessels and move up the vein toward the lungs, becoming a life-threatening event called a pulmonary embolism. Dr. Treacy testified, however, that

most DVTs are asymptomatic, with no signs or symptoms associated with the blood clot in the deep vein, and are dissolved by the body. Dr. Treacy testified that the percentage risk of a symptomatic DVT occurring in a lower extremity injury, after foot and ankle surgery for example, is 1% or less. Dr. Treacy testified that there remained a dearth of literature regarding nonsurgical patients experiencing a DVT.

¶ 12        Dr. Treacy testified that he outlined for Glenn a general treatment program that included a two-week follow-up appointment, even though it would have been reasonable for Glenn to return in three weeks for a follow-up appointment. Dr. Treacy nevertheless testified that, if a Rezin Orthopedics receptionist encountered an issue with scheduling Glenn within the two-week time frame he had recommended, he would have expected her to seek permission to change the time frame.

¶ 13        Dr. Treacy testified that he was anticipating at the two-week time frame to modify Glenn's cast from a plantar flexion position to a more neutral position so that Glenn may begin to bear weight, to evaluate whether the tissue was healing to determine whether surgical treatment or a different cast type may be necessary, and to identify the next step in Glenn's course of treatment. Dr. Treacy testified that he intended to assess Glenn's healing process, document his history, and physically examine him, much like the physical examination completed on February 17, 2009.

¶ 14        Dr. Treacy testified that he would expect swelling to result from Glenn's injury, but he acknowledged that swelling of the legs may also be considered a risk factor for DVT. Dr. Treacy explained that simply elevating a swollen leg would not resolve tightness caused by DVT. Dr. Treacy testified that, if Glenn had been complaining at a follow-up appointment of tightness and pain in his cast, his complaints may have indicated a DVT or they may have resulted from sitting, cast irritation, or compartment syndrome. Dr. Treacy acknowledged, however, that if he suspected a DVT, he could utilize an ultrasound scan to rule out such a diagnosis. When asked whether tightness in the casted leg and pain in the area would have led to a clinical diagnosis of a DVT, Dr. Treacy testified that a DVT "can be hard to diagnose [because] [its] presentation can vary." Dr. Treacy testified that "it [is] definitely one of the things you are thinking about in that context." Dr. Treacy acknowledged that, where a DVT is diagnosed and anticoagulation therapy is provided, the vast majority of patients will survive. Dr. Treacy opined, however,

that "[a]nticoagulation therapy does not necessarily stop every DVT [from] becoming a [pulmonary embolism]."

¶ 15　　Dr. Treacy testified that he did not recommend Glenn's return in two weeks specifically to evaluate for the presence of a DVT. Acknowledging that two weeks from February 17, 2009, calculated to March 3, 2009, Dr. Treacy testified that he was not aware that Glenn's follow-up appointment had been scheduled for March 13, 2009, until after he learned of Glenn's death.

¶ 16　　Decker testified that the physicians at Rezin Orthopedics memorialized their orders to the receptionists with regard to patient follow-up by writing their directions on the bottom of the super bill, which made its way to the reception area at the end of the patient's visit. Decker acknowledged that, if necessary, she would seek clarification regarding a follow-up appointment from the physician. Decker acknowledged that she did not schedule Glenn's follow-up appointment within two weeks of February 17, 2009, but had no specific recollection as to why. Hare testified that she also did not recall the specific reason for selecting March 13, 2009, for Glenn's follow-up appointment. Likewise, Popplewell, the Rezin Orthopedics receptionist who would have responded to Glenn's telephone call on February 25, 2009, had no memory of the details of her conversation with Glenn, but Popplewell acknowledged that she could have paged or contacted the physician with patient concerns.

¶ 17　　The plaintiff presented the expert testimony of Dr. Matthew Lawrence Jimenez, an orthopedic surgeon. Dr. Jimenez testified that Glenn died from a large saddle embolus, meaning that a large blood clot, shaped like a giant worm, blocked both sides of the pulmonary tree, draping like a saddle over the two pulmonary main vessels leading to the lungs, so that no blood or oxygen could flow to the area. Dr. Jimenez testified that, after reviewing the chronology and the symptoms Glenn experienced, he determined that Glenn sustained a blood clot in his calf that moved to his thigh, causing him thigh pain on March 7, 2009. Dr. Jimenez testified that the clot began in the leg, grew, and clotted as it moved up the vessel. Dr. Jimenez testified that the danger of a small vein clot below the knee is generally limited because such a clot breaking free does not occlude the vessels. Dr. Jimenez explained, however, that a clot breaking free from the larger vessels in the thigh may be fatal.

¶ 18    Dr. Jimenez testified that a blood clot in the leg causes pain and disability and may create chronic leg and ankle swelling because it clogs the vessels that drain the leg. Dr. Jimenez testified that a blood clot in the leg would be significant but not necessarily life threatening. Dr. Jimenez reiterated, however, that a clot breaking free and traveling to the lungs is potentially fatal.

¶ 19    Dr. Jimenez opined that Glenn would likely have survived had he been evaluated in the two-week time frame prescribed by Dr. Treacy. Dr. Jimenez cited Glenn's risk factors for clotting as the casting, immobility, elevated body mass index, and age. Dr. Jimenez explained that, before Glenn experienced pain above the knee, Dr. Treacy could have treated the blood clot with a high dose of medication to dissolve it before it moved above the knee, became dangerous, and killed him. Dr. Jimenez testified that if Glenn had been examined between February 26 and March 5, 2009, his death likely would have been prevented.

¶ 20    Dr. Jimenez acknowledged that the risk of developing a DVT is low, that the risk of developing pulmonary embolism resulting from DVT is less than 3%, and that the risk of suffering a fatal pulmonary embolism is less than 1%. Dr. Jimenez also acknowledged that the overall rates of readmission to a hospital, after previous release, as a result of a pulmonary embolism and a DVT were low, 0.34% and 0.05%, respectively, and that the rates of thrombosis and thromboembolic disease following foot and ankle surgery were low. Dr. Jimenez admitted that a DVT can form over a matter of hours, days, or weeks and cause some symptoms or cause no symptoms with the first sign as sudden death. Dr. Jimenez further acknowledged that a DVT may remain a DVT and never become a pulmonary embolism. Dr. Jimenez opined that whether and when a clot will form in a deep vein involve unpredictable, random events. Dr. Jimenez conceded that the first time Glenn complained of feeling pain indicating a suprapopliteal clot, a clot in the veins above the knee, which is more likely to embolize to the lungs and be fatal, was March 7, 2009, the night before he died.

¶ 21    The defendants presented the testimony of Dr. Michael Steven Pinzur. Dr. Pinzur, an orthopedic surgeon, testified that whether Glenn was scheduled for a three-week follow-up appointment or the two-week follow-up appointment recommended by Dr. Treacy was inconsequential. Dr. Pinzur explained that it would have been reasonable to direct follow-up treatment between four to six

weeks and that reexamination at two weeks did not "really impact on the care." Dr. Pinzur opined that the next key point involved cast removal in four to six weeks. Dr. Pinzur testified that the risk of a propagation of a clot below the knee was so low that the necessity of chemoprophylaxis treatment, *i.e.*, prescribing medication to prevent a complication or condition, was questionable. When asked whether Glenn's tightness in his cast indicated that he experienced a DVT prior to March 3, Dr. Pinzur explained that all patients wearing casts swell because arteries pump blood to tissues, veins rely on the muscles around them to pump the fluid out, and, when immobilized, the muscles cannot effectively pump the fluid out. Dr. Pinzur testified that swelling often occurs as the day progresses, resolves when elevated, and becomes a concern only when not resolved by elevation.

¶ 22       Dr. Pinzur acknowledged that, when a DVT is discovered in a lower extremity, the success rate of treatment is very high. Dr. Pinzur testified, however, that, had Glenn been examined and complained of swelling and achiness within the two-week instruction, Dr. Treacy would have been in a position to diagnose the development of a DVT only if it had already occurred. Dr. Pinzur explained that it was unclear when the DVT occurred in Glenn's case.

¶ 23       The defense also presented the expert testimony of Dr. Jeffrey Paul Huml. Dr. Huml, a pulmonologist, opined that, based upon a reasonable degree of medical certainty, Glenn was not at high risk for development of a DVT because he incurred an isolated lower extremity injury, was not of advanced age, did not incur a fracture, was not obese, and had not undergone surgery. Dr. Huml opined that it was exceedingly rare for a blood clot to develop five to six weeks after injury, as occurred in this case. Dr. Huml testified that the incidence of DVT formation following Achilles tendon rupture is very low, less than 3%, probably less than 1%. Dr. Huml testified that, of those, virtually none result in fatal pulmonary embolism. Dr. Huml testified that in 2009 there were no case reports in the history of the English medical literature of fatal pulmonary embolism from an isolated Achilles tendon injury. Dr. Huml explained "the incidence of clinically significant [DVT] is *** that the problem is really rare, that it occurs in less than one percent, probably 0.43 percent," and the incidence of pulmonary embolism is less, "virtually unheard of."

¶ 24　　Dr. Huml testified that Glenn's first sign of a clinically significant DVT was his complaint of thigh pain on March 7, 2009. Dr. Huml acknowledged that prior to March 7, 2009, Glenn had complained of pain and tightness in the cast and calf, which may have been indicative of development of a DVT that had propagated and caused thigh pain. Dr. Huml also testified, however, that Glenn's cast tightness may have resulted from dependent edema, swelling that occurs after periods of standing and resolves through leg elevation. Dr. Huml explained that a DVT may propagate and become a pulmonary embolism or dissolve on its own and cause no harm. Dr. Huml testified that, in the context of a pulmonary embolus that is described as a saddle embolism, the initial presentation may be sudden death. Accordingly, Dr. Huml concluded that the initial presenting symptom of the pulmonary embolism in this case was Glenn's sudden death.

¶ 25　　The defense further submitted the expert testimony of Dr. Jacob Bitran, who testified that Glenn presented a low risk for a DVT. At the close of evidence, during closing arguments, defense counsel argued as follows:

"So we heard from Jodi Decker. She testified on February 17th that she made the appointment for [Glenn] to have his cast placed in accordance with Dr. Treacy's instruction. His instruction was to have the cast placed in a day or two. Jodi Decker did that. She also said that scheduling with [Glenn] was a little difficult. And we have evidence that—so Jodi Decker got [Glenn] to commit to the cast placement appointment with the intent that when he came back for the cast placement appointment, he would schedule the next follow-up visit."

The plaintiff objected to the argument as misstating the evidence. The circuit court admonished the jurors that closing argument is not evidence and that they should disregard any argument inconsistent with the evidence.

¶ 26　　On November 10, 2016, the jury returned a verdict in favor of both defendants and against the plaintiff, and the circuit court entered judgment on the verdict. On February 10, 2017, the plaintiff filed a motion for judgment *n.o.v.* and a new trial on damages against Rezin Orthopedics, for failing to schedule the two-week, follow-up appointment, or as an alternative a motion for new trial on all allegations against Rezin Orthopedics. In her motion, the plaintiff argued that a plaintiff's verdict was supported by testimony that the Rezin Orthopedics receptionists failed to schedule Glenn for a two-week, follow-up appointment according to Dr.

Treacy's order. In arguing for judgment *n.o.v.* in the circuit court, the plaintiff asserted that the issue of proximate cause should have been limited to whether the DVT would have been diagnosable and treatable if Glenn had been reexamined within the two-week time frame ordered by Dr. Treacy. The plaintiff argued that the evidence so overwhelmingly favored the plaintiff that no contrary verdict on the evidence could ever stand. After the circuit court denied the plaintiff's post-trial motion, the plaintiff filed a notice of appeal, appealing solely the judgment favoring Rezin Orthopedics.

¶ 27                                                    Appeal

¶ 28       The appellate court agreed with the plaintiff. The appellate court concluded that Rezin Orthopedics breached the standard of care by failing to follow the written order on the super bill, which instructed the receptionists to schedule Glenn's follow-up appointment within two weeks of February 19, 2009. 2019 IL App (3d) 170299-U, ¶ 28. The appellate court found no evidence suggesting that Rezin Orthopedics scheduled or attempted to schedule the follow-up appointment between February 19 and March 3, 2009, as it was required to do. *Id.* Turning to the issue of proximate cause, the appellate court found that the evidence supported the conclusion that if Glenn had returned to Rezin Orthopedics within two weeks, his DVT would have likely been diagnosed and treated. *Id.* ¶ 31. The appellate court noted the expert testimony indicating that the fatal pulmonary embolism resulted from a DVT that originated in Glenn's casted leg and that a DVT is easily diagnosed and treatable. *Id.* The appellate court also noted the plaintiff's testimony that Glenn was experiencing discomfort and swelling in his leg shortly after he was fitted for the cast on February 19. *Id.* The appellate court concluded that Rezin Orthopedics' failure to schedule a follow-up appointment within two weeks was thus a proximate cause of Glenn's death. *Id.* Concluding that the evidence and inferences, when viewed in a light most favorable to Rezin Orthopedics, so overwhelmingly favored the plaintiff that no contrary verdict could ever stand, the appellate court reversed the circuit court's judgment and remanded the cause with directions for the circuit court to enter judgment in favor of the plaintiff on the issue of liability and to hold a new trial on the issue of damages only. *Id.* ¶ 32.

¶ 29    Thereafter, this court allowed Rezin Orthopedics' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2018). The Illinois Trial Lawyers Association was granted leave to submit an *amicus curiae* brief in support of the plaintiff's position, and the University of Chicago Medicine, Ingalls Memorial Hospital, Rush University Medical Center, Northshore University Health System, Advocate Health Care, Northwestern Memorial Hospital, Loyola University Medical Center, and Southern Illinois Healthcare were granted leave to submit an *amicus curiae* brief in support of Rezin Orthopedics' position. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). The Illinois Association of Defense Trial Counsel was also granted leave to submit an *amicus curiae* brief in support of Rezin Orthopedics' position. *Id.*

¶ 30                                    ANALYSIS

¶ 31    In its appeal to this court, Rezin Orthopedics argues that the appellate court erred in entering judgment *n.o.v.* because the plaintiff failed to meet the stringent standards governing its entry on the issues of standard of care, breach, and proximate cause. Rezin Orthopedics argues that the record clearly reveals a question of fact on the issue of proximate cause, among others, and that substantial evidence supported the jury's finding that its conduct was not a factual or legal cause of Glenn's death and supported the resulting defense verdict. See *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 102 (2010).

¶ 32    The plaintiff maintains, *inter alia*, that the appellate court properly determined that she was entitled to judgment *n.o.v.* on the issue of proximate cause because of the overwhelming and uncontroverted evidence. Alternatively, the plaintiff maintains that she is entitled to a new trial because the jury's verdict was against the manifest weight of the evidence. The plaintiff also alternatively contends that, in the event the appellate court's judgment is reversed, this court should remand the cause to the appellate court to determine if she is entitled to a new trial as a result of trial court errors.

¶ 33                              Judgment *N.O.V.*

¶ 34    "A judgment *n.o.v.* should be granted only when 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a]

movant that no contrary verdict based on that evidence could ever stand.' " *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). The *Pedrick* standard for entry of judgment *n.o.v.* is a high one, and its entry is inappropriate where reasonable minds may differ as to the inferences and conclusions to be drawn from the facts presented. *Id.* at 178 "A court of review 'should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way [Citations.]' " *Id.* (quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53 (1992)). This court reviews *de novo* the circuit court's decision denying the plaintiff's motion for judgment *n.o.v.* and the appellate court's decision granting the plaintiff's motion for judgment *n.o.v. Id.*; *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999).

¶ 35        The plaintiff's action against Rezin Orthopedics involved institutional negligence, also known as direct corporate negligence. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 291 (2000). Since *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326 (1995), Illinois has recognized an independent duty of hospitals to assume responsibility for the care of their patients. *Jones*, 191 Ill. 2d at 291.

> "[I]n recognizing hospital institutional negligence as a cause of action, *Darling* merely applied principles of common law negligence to hospitals in a manner that comports with the true scope of their operations. See *Darling*, 33 Ill. 2d at 331 (noting that the duty in negligence cases is always the same, to conform the legal standard of reasonable conduct in light of the apparent risk)." *Id.* at 292-93 (doctrine of institutional negligence may also be applied to health maintenance organizations because, like hospitals, they consist of an amalgam of many individuals who play various roles to provide comprehensive health care services to their members and wear three different hats, one of which is medical provider, and they thus have corresponding corporate responsibilities as well).

¶ 36        "To recover damages based upon a defendant's alleged negligence, a plaintiff must allege and prove that the defendant owed a duty to the plaintiff, that defendant breached that duty, and that the breach was the proximate cause of the plaintiff's

injuries." *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 256 (1999). The general verdict rendered by the jury in this case creates a presumption that the jury found in favor of Rezin Orthopedics on every defense raised, including the lack of proximate cause. See *Lazenby*, 236 Ill. 2d at 102. Thus, although the parties' arguments raise questions regarding the standard of care and whether Rezin Orthopedics breached that standard, we may assume the standard and its breach for the sake of discussion, in order to address the proximate cause issue. See *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257 (2004).

¶ 37    The term "proximate cause" embodies two distinct requirements: cause in fact and legal cause. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992). "Cause in fact" is established where there is reasonable certainty that the injury would not have occurred "but for" the defendant's conduct or where a defendant's conduct was a "substantial factor" in bringing about the harm. *Turcios v. The DeBruler Co.*, 2015 IL 117962, ¶ 23. "In contrast, legal cause involves an assessment of foreseeability." *Id.* ¶ 24. Legal cause is established only when the injury is reasonably foreseeable (*id.*), *i.e.*, when the defendant's conduct is " 'so closely tied to the plaintiff's injury that he should be held legally responsible for it' " (*Simmons v. Garces*, 198 Ill. 2d 541, 558 (2002) (quoting *McCraw v. Cegielski*, 287 Ill. App. 3d 871, 873 (1996))). Legal cause is established where the injury is the type of injury that a reasonable person would see as a " 'likely result' " of his conduct and is not established where the injury is so " 'highly extraordinary' " that imposing liability is not justified. *Turcios*, 2015 IL 117962, ¶ 24. "Importantly, 'the injury suffered by the plaintiff must be the natural and not merely a remote consequence of the defendant's act.' " *Id.* ¶ 27 (quoting *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 58 (1994); see Prosser and Keeton on the Law of Torts § 41, at 264 (W. Page Keeton *et al.* eds., 5th ed. 1984) (hereinafter Prosser & Keeton on Torts) ("As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.").

¶ 38    Because proximate cause ordinarily is a question for the trier of fact, a judgment *n.o.v.* should not be granted in favor of the plaintiff unless " 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly

favors movant that no contrary verdict based on that evidence could ever stand.' " *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257 (1999) (quoting *Pedrick*, 37 Ill. 2d at 510). Because the evidence in the case *sub judice*, when viewed in its aspect most favorable to Rezin Orthopedics, does not so overwhelmingly favor the plaintiff that no contrary verdict based on the evidence could ever stand, we must reverse the appellate court's judgment *n.o.v.*

¶ 39  In entering judgment *n.o.v.*, the appellate court concluded in one paragraph that the evidence at trial showed that, if Glenn had returned to Rezin Orthopedics within two weeks of his initial appointment, the DVT would have likely been diagnosed and treated and, thus, the evidence supported the conclusion that Rezin Orthopedics' negligence was a proximate cause of Glenn's death. 2019 IL App (3d) 170299-U, ¶ 31. In reaching this conclusion, the appellate court ignored the evidence at trial supporting a reasonable conclusion that the DVT formed after March 3, 2009, and not within the two-week time frame for the prescribed follow-up appointment. Evidence at trial revealed that Glenn's tightness and achiness somewhat improved after the February 25 telephone call, that swelling may occur for reasons other than a DVT, and that Glenn's first significant symptom of a dangerous DVT occurred with thigh pain on March 7, 2009. The evidence thus supported a reasonable conclusion that Rezin Orthopedics' failure to schedule a two-week follow-up appointment was not a substantial factor of Glenn's death. The appellate court thus improperly substituted its judgment for that of the jury.

¶ 40  Additionally, to prevail on her negligence claim, the plaintiff must have sufficiently presented facts demonstrating both cause in fact and legal cause: the failure to prove either results in the failure to prove proximate cause. See *Young v. Bryco Arms*, 213 Ill. 2d 433, 447 (2004). However, the appellate court did not address legal cause, *i.e.*, whether Glenn's injury was the natural, and not merely a remote, consequence of Rezin Orthopedics' failure to schedule his follow-up appointment within two weeks of his initial appointment. See *Turcios*, 2015 IL 117962, ¶ 24. Yet the jury heard significant expert testimony that Glenn's development of a DVT and subsequent fatal pulmonary embolism were medically unforeseen. Dr. Huml and Dr. Bitran testified that Glenn did not meet the criteria to make him at higher risk for a DVT and that a DVT occurs in less than 1% of patients with a lower-extremity tendon injury. Dr. Huml testified that, of those, virtually none result in fatal pulmonary embolism. Dr. Huml explained that, in

- 14 -

2009, there were no case reports in the history of the English medical literature of fatal pulmonary embolism with an isolated Achilles tendon injury. Dr. Huml testified that "the incidence of clinically significant [DVT] is *** that the problem is really rare, *** it occurs in less than one percent, probably 0.43 percent" and that the incidence of pulmonary embolism is less, "virtually unheard of." Dr. Jimenez also acknowledged that the risk of fatal pulmonary embolism was less than 1% and that the risk of developing a DVT was also low.

¶ 41        Accordingly, ample evidence supported a reasonable conclusion that the pulmonary embolism resulting from a propagating DVT originating from an Achilles tendon tear was not the type of injury that a reasonable medical facility would see as a "likely result" of scheduling a follow-up appointment at three weeks, instead of two weeks. Instead, evidence was presented at trial revealing Glenn's death was so "highly extraordinary" that imposing liability was not justified. See *id.* Legal responsibility must be limited to those causes that are so closely connected with the result and are of such significance that the law justifiably imposes liability. See *id.* ¶ 27; Prosser & Keeton on Torts § 41. Because evidence at trial supported a conclusion that Glenn's death was not a reasonably foreseeable result of Rezin Orthopedics' failure to schedule his follow-up appointment within two weeks of his initial appointment, the evidence also failed to support a finding of legal cause. For the foregoing reasons, the *Pedrick* standard has not been met, and we therefore reverse the appellate court's judgment *n.o.v.*

¶ 42                              Request for New Trial

¶ 43        The plaintiff argues, alternatively, that the cause should be remanded to the appellate court to decide whether she is entitled to a new trial because the verdict was against the manifest weight of the evidence and because the circuit court allowed irrelevant and highly prejudicial evidence and argument at trial.

¶ 44        The standard of review applied to a motion for a new trial is different than that applied to a motion for judgment *n.o.v. Lazenby*, 236 Ill. 2d at 100. On a motion for new trial, the court, after considering the evidence, will set aside the jury's verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Id.* at 100-01. A verdict is contrary to the manifest weight of the evidence "where the opposite conclusion is clearly evident or where the findings of the jury

- 15 -

are unreasonable, arbitrary[,] and not based upon any of the evidence." (Internal quotation marks omitted.) *Maple*, 151 Ill. 2d at 454. "We will not reverse a court's ruling on a motion for new trial unless it is affirmatively shown that the trial court clearly abused its discretion." *Lazenby*, 236 Ill. 2d at 101.

¶ 45     The plaintiff has also failed to meet her burden to establish entitlement to a new trial. After careful review of the evidence adduced at trial, as set forth above, we cannot conclude that a conclusion opposite that of the jury was clearly evident or that the jury's findings were unreasonable, arbitrary, or not based upon the evidence. Evidence at trial supported the conclusion that Rezin Orthopedics' alleged failures were not the proximate cause of Glenn's fatal pulmonary embolism resulting from a DVT occurring after an Achilles tendon tear.

¶ 46     "It is well established that, in an appeal from a jury verdict, a reviewing court may not simply reweigh the evidence and substitute its judgment for that of the jury." *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003). The evidence before the jury presented credibility issues, and the jury could have reasonably found that the plaintiff failed to carry her burden to prove proximate cause. The jury's finding was not manifestly erroneous. Consequently, we conclude that the circuit court properly denied the plaintiff's motion for new trial.

¶ 47     The plaintiff also requests a new trial on the alternative basis that the admission of irrelevant and highly prejudicial evidence and argument denied her a fair trial below. The plaintiff argues that (1) the circuit court erred when it allowed the defense to interject irrelevant, confusing, prejudicial, and improperly hypothetical testimony to the jury about the standard of care that applied to Dr. Treacy; (2) the circuit court erred in prohibiting testimony regarding Glenn's February 25 telephone conversation with Rezin Orthopedics; and (3) the defense improperly interjected deposition testimony as part of the closing argument and, based on these comments, the jury may have improperly decided that Glenn caused the delay in his scheduling.

¶ 48     We agree with Rezin Orthopedics, however, that the plaintiff's allegations of error involve the admission of evidence or argument regarding the standard of care and the breach thereof. In light of our determination that the evidence at trial supported a conclusion that Rezin Orthopedics' failures did not proximately cause Glenn's death, the determination of these errors is not essential to our disposition.

- 16 -

See *Peach v. McGovern*, 2019 IL 123156, ¶ 64 (courts of review will ordinarily not consider issues that are not essential to the disposition of the causes before them). In addition, defense counsel's comments during closing argument did not deny the plaintiff a fair trial because the comments were brief and isolated when considered in the context of the lengthy closing argument and seven-day trial and the circuit court, in response to the plaintiff's objections to the comments, immediately admonished the jury that lawyers' statements were not evidence and should be disregarded if they were not based on evidence or on reasonable inferences that could be drawn from the evidence. Viewing the closing argument as a whole, the alleged impropriety does not warrant a new trial. See *Bruske v. Arnold*, 44 Ill. 2d 132, 138 (1969).

¶ 49     Accordingly, we find that the circuit court properly denied the plaintiff's motion for judgment *n.o.v.* and alternative motion for new trial. We will not usurp the jury's function to substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence, which did not greatly preponderate either way. See *Snelson*, 204 Ill. 2d at 36. This court has recently emphasized that " ' "[i]t is the jury, not the court, which is the fact-finding body," ' " stating:

> " ' "[The jury] weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. *** That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." ' [Citation.]" *Peach*, 2019 IL 123156, ¶ 61.

¶ 50     In this case, the jury was required to listen to the conflicting evidence presented and use its best judgment to determine where the truth could be found. See *Snelson*, 204 Ill. 2d at 36. The jury found in favor of Rezin Orthopedics and against the plaintiff. Ample testimony rebutted the plaintiff's causation theory and supported the circuit court's decision denying the plaintiff's post-trial motion for judgment *n.o.v.* or for new trial. Consequently, we reverse the appellate court's judgment holding otherwise.

¶ 51                                     CONCLUSION

¶ 52        For the foregoing reasons, the judgment of the appellate court is reversed, and
the judgment of the circuit court is affirmed.


¶ 53        Appellate court judgment reversed.

¶ 54        Circuit court judgment affirmed.